**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

DOMINIQUE L. FREILINGER,

        Claimant,

vs.

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

No. 20-CV-2001-LRR

**REPORT AND
RECOMMENDATION**

_____

     Dominique L. Freilinger ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381-85. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons that follow, I recommend that the Commissioner's decision be **affirmed**.

## I.    BACKGROUND

     I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 11) and only summarize the pertinent facts here. Claimant was born July 30, 1977. (AR[1] at 185.) Claimant has at least a high school education and is able to communicate in English. (*Id.* at 18.) She allegedly became disabled due to major depressive disorder, anxiety disorder, and arthritis. (*Id.* at 207.) Claimant's onset of disability date was February 9,

_____

[1] "AR" cites refer to pages in the Administrative Record.

2017.[2] (*Id.* at 10.) Claimant filed an application for SSI on February 9, 2017. (*Id.*) Her claim was denied originally and on reconsideration. (*Id.* at 91-95, 105-09.) A video hearing was held on April 29, 2019, with Claimant and her attorney, Hugh Field, in Waterloo, Iowa and ALJ Robert Kelly in West Des Moines, Iowa. (*Id.* at 31-59.) Vocational expert ("VE") Jeff Johnson appeared by telephone. (*Id.* at 34.) Claimant and the VE testified. (*Id.* at 37-58.) The ALJ issued an unfavorable decision on May 22, 2019. (*Id.* at 10-20.)

Claimant requested review and the Appeals Council denied review on November 12, 2019. (*Id.* at 1-5.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On January 16, 2020, Claimant timely filed her complaint in this Court. (Doc. 4.) On August 13, 2020, briefing deadlines expired and the Honorable Linda R. Reade referred the case to me for a Report and Recommendation. On August 14, 2020, Claimant filed an Unresisted Motion for Extension of Time to File Plaintiff's Reply Brief. (Doc. 15), which I granted (Doc. 16). Claimant filed her Reply Brief on August 17, 2020. (Doc. 17.)

## II. DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

---

[2] Claimant had originally listed March 29, 2013 as her alleged onset of disability date. (AR at 185.) At the hearing, she amended that date to February 9, 2017. (*Id.* at 54.)

is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the

3

ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to this application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

4

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id*. §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.      *The ALJ'S Findings*

The ALJ made the following findings regarding Claimant's disability status at each step of the five-step process. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset of disability date of February 9, 2017. (AR at 12.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: depression and anxiety. (*Id*.) The ALJ found Claimant's inflammatory arthritis to be a nonsevere impairment. (*Id*.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id*. at 13.)

The ALJ evaluated Claimant's claims under listings 12.04 (depressive, bipolar and related disorders); and 12.06 (anxiety and obsessive-compulsive disorders). (*Id*. at 13-14.)

At step four, the ALJ found that Claimant had the following RFC:

[T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations: She can tolerate only occasional interaction with the general public. She may be off-task or work at a slow pace for as much as 5% of the workday. The claimant cannot perform work that requires performing effectively under stress such as first-responder work (e.g., police officer,

fire fighter, or ambulance driver). The claimant can tolerate only occasional
changes in the work setting or work tasks.

(*Id.* at 14.)  The ALJ also found that Claimant had no past relevant work.  (*Id.* at 18.)
At step five, the ALJ found there were jobs that existed in significant numbers in the
national economy Claimant could perform, including cleaner, commercial; hand
packager;  cleaner II; and cleaner, housekeeping.  (*Id.* at 19.)  Therefore, the ALJ
concluded that Claimant was not disabled.  (*Id.*)[3]

**B.**    ***The Substantial Evidence Standard***

The ALJ's decision must be affirmed "if it is supported by substantial evidence on
the record as a whole."  *Moore*, 572 F.3d at 522.  "The phrase 'substantial evidence' is

---

[3] The ALJ addressed one final point that is not relevant to the issues currently before this Court:

> In pre-hearing correspondence, the claimant's representative objected to these job
> numbers on the ground that the vocational expert lacked appropriate qualifications
> (Exhibit 17E/2). The Social Security Administration regulations take
> administrative notice that the job information provided by various governmental
> and other publications including the Dictionary of Occupational Titles is reliable
> (20 CFR 416.966(d)). Additionally, the Commissioner has determined that the
> impartial vocational expert is qualified, based upon his education and experience,
> to offer an opinion regarding the number of jobs available in the national
> economy. To the extent that conflicts exist between the information contained in
> the Dictionary of Occupational Titles and the vocational expert's testimony, the
> undersigned is satisfied that his testimony is well-founded based upon his
> experience in job placement and career counseling, and on information available
> in other reliable publications. Without question, Social Security Ruling 00-4p
> identifies these as reasonable explanations for conflicts in occupational
> information. Accordingly, the vocational expert's job information is found to be
> reliable. Finally, the undersigned notes that the claimant's representative did not
> renew the objection at the hearing. In sum, the undersigned finds the pre-hearing
> arguments advanced by the claimant's representative to be without merit;
> therefore, the pre-hearing objection has been overruled.

(AR at 19.)

a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). Thus, a court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

### III. DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to provide good reasons for the weight afforded to her treating psychologist's opinions; (B) failing to provide a rationale for not including limitations found by state agency reviewing psychological consultants in the RFC; and (C) failing to provide good reasons for finding she was not credibly reporting her limitations.

### A. Whether the ALJ Properly Weighed the Opinion of Treating Psychiatrist Abdur Rahim, M.D.

On April 5, 2019, Dr. Abdur Rahim completed a check-box/fill-in-the blank opinion form in which he stated that he had been treating Claimant every three months for three years. (AR at 418.) Dr. Rahim checked the following "signs and symptoms" that he said Claimant experienced: decreased energy; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; persistent disturbance of mood or affect; apprehensive expectation; perceptual or thinking disturbances; sleep disturbances; and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehensions, fear, terror and sense of impending doom occurring on the average of at least once a week. (*Id.* at 419.) Dr. Rahim stated Claimant's ability to remember work-like procedures was seriously limited. (*Id.* at 420.) Dr. Rahim opined Claimant was unable to meet competitive standards in the areas of maintaining attention for a two-hour segment; sustaining ordinary routine without special supervision; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; understanding and remembering detailed instructions; carrying out detailed instructions; setting realistic goals or making plans independently of others; traveling in unfamiliar places; and using public transportation. (*Id.* at 420-21.)

He further opined that Claimant had no useful ability to function in the areas of maintaining regular attendance and being punctual within customary, usually strict tolerances; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding

8

appropriately to changes in a routine work setting; dealing with normal work stress; dealing with stress of semiskilled and skilled work; interacting appropriately with the general public; and maintaining socially-appropriate behavior. (*Id.*) Dr. Rahim stated that the reasons for these limitations were "panic attacks in work or any public setting." "panic attack debilitating in public," and "Again, panic attacks when leaving home, public/work settings, anytime around people." (*Id.* at 421.) In response to the following, "Describe the *clinical findings* including results of mental status examination that demonstrate the severity of your patient's mental impairments and symptoms" Dr. Rahim stated, "sad, depressed, [increased] anxiety, panic attacks leaving home [patient] being around others, obsessive thinking." (*Id.* at 418 (emphasis in original).) He also opined that Claimant would miss more than four days of work per month. (*Id.* at 422.)

The ALJ gave the opinion little weight for the following reasons:

> [The opinion] is inconsistent with the objective evidence including the claimant's benign clinical findings and relatively normal activities of daily living. Ultimately, this checklist-style form appears to have been completed as an accommodation to the claimant and includes only conclusions regarding functional limitations without any rationale for those conclusions. The undersigned finds this evidence has little probative value because it is not supported by the underlying objective evidence.

(*Id.* at 17.)

### 1.    The Parties' Arguments

Claimant argues that the ALJ's "complaint" that Dr. Rahim's opinion was "in a "check-list form [that] appeared to have been completed as an accommodation to the claimant" was not a sufficient rationale, by itself, to assign Dr. Rahim's opinions little weight. (Doc. 12 at 6 (citing *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) for the proposition that the Eighth Circuit has "never upheld a decision to discount an MMS on the basis that the 'evaluation by box category' is deficient *ispso facto*.") Claimant argues that this was especially erroneous in this case because Dr. Rahim

explained the basis for his opinions and "that basis was supported by his treatment notes." (*Id.* (citing AR at 18, 20).) Claimant also argues that the ALJ failed to provide good reasons for giving Dr. Rahim's opinion little weight. (*Id.* at 4-6 (citing *Lucus v. Saul*, --F.3d.--, 2020 WL 28992228, at *3 (8th Cir. June 3, 2020).) Specifically, Claimant argues that the ALJ did not "adequately explain what he found to be inconsistencies in Dr. Rahim's opinion" because the ALJ did not cite to the record to support his decision. (*Id.* at 6.) According to Claimant, Dr. Rahim's opinion was consistent with his treatment notes, which documented Claimant's "longstanding problems with functioning in public." (*Id.*)

Finally, Claimant argues that the ALJ incorrectly relied on her ability to perform certain activities as equal to an ability to perform fulltime competitive work and that the ALJ was improperly requiring her to prove she was bedridden to qualify for benefits. (*Id.* at 7 (citations omitted).) Claimant asserts that the ALJ's error to properly weigh Dr. Rahim's opinion was harmful because the limitations provided in Dr. Rahim's opinion precluded competitive work and therefore remand is required. (*Id.* at 7-8.)

The Commissioner counters that the ALJ properly evaluated Dr. Rahim's opinion. (Doc. 13 at 7.) Specifically, the Commissioner asserts that the ALJ "discounted Dr. Rahim's checklist opinion because it contained conclusions that Dr. Rahim did not explain, conflicted with plaintiff's activities of daily living and the longitudinal medical evidence, and it seemed Dr. Rahim drafted it as an accommodation to help plaintiff obtain disability." (*Id.* at 9.)

### 2. *Legal Standard for Evaluating Dr. Rahim's Opinion*

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). An ALJ must "give good reasons" for the weight given to a treating

physician's opinion. 20 C.F.R. § 404.1527(c)(2). "A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record as a whole.[4] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). "Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (citation and brackets omitted). However, a treating physician's opinion can be given limited weight if it contains only conclusory statements, contains inconsistent opinions "that undermine the credibility of such opinions," is inconsistent with the record, or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* (citations omitted). A treating physician's statement that is "not supported by diagnoses based on objective evidence" will not support a finding of disability. *Edwards v. Barnhart,* 314 F.3d 964, 967 (8th Cir. 2003) (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)). If the opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." *Id.* (citation omitted).

When a treating physician's medical opinion is not given controlling weight, the following factors will be examined to determine the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2).

---

[4] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations were effective as of March 27, 2017. *See* 20 C.F.R. § 404.1527. However, Claimant's claim was filed on February 9, 2017. Thus, the old regulations apply. *See id.*

### 3.    Analysis

Claimant does not clearly base her arguments on any of the factors cited above. However, the parties appear to be at odds over supportability and consistency.

#### a.    Supportability

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion."   20 C.F.R. § 404.1527(c)(3).   "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions."  *Hacker*, 459 F.3d at 937.  In addition, "'[t]he checklist format, generality, and incompleteness of the assessments limit [an] assessment's evidentiary value.'"  *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted)); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."); *see also Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) ("[Dr. Hollis] assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record.") (internal quotations and citations omitted). Therefore, a treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions."  *Papesh*, 786 F.3d at 1132 (quotation omitted).

The ALJ stated, "Although the opinions of the claimant's treating provider are generally considered more reliable because of the duration of the treating relationship,

this opinion of Dr. Rahim is inconsistent with the objective evidence including the claimant's benign clinical findings. . . ." (AR at 17.)

The Commissioner argues that Dr. Rahim's treatment notes do not support his opinion. The Commissioner asserts that because the only explanation for the limitations Dr. Rahim included in his opinion were "panic attacks in work or any public setting," "panic attacks debilitating in public," and "again, panic attacks when leaving home, public/work settings, anytime around people," the ALJ was justified in discounting the opinion because Dr. Rahim failed to properly explain the reasons for his limitations. (Doc. 13 at 9.) The Commissioner avers that without an explanation of the evidence he relied upon to support his conclusions, Dr. Rahim's opinion "cannot serve as substantial evidence for plaintiff's disability claim." (*Id.*) The Commissioner further argues that Dr. Rahim's treatment notes show that Claimant "most often reported no issues with panic[, which] contradict[s] his heavy emphasis of panic attacks" in his opinion and that when Claimant did report panic and low mood, it was often in response to situational stressors, which cannot provide the basis of a disability claim. (*Id.* at 10-11 (citations omitted).)

To rebut this finding, Claimant cites treatment notes where Dr. Rahim discussed her "difficulties with crowded places and leaving her home," anxiety, panic attacks, difficulties being around other people, and obsessive thinking. (Doc. 12 at 5 (citing AR at 310, 314, 320, 395, 400, 431, 465, 469, 475); Doc. 17 at 2 (citing, *inter alia*, AR at 399).) In April 2016, Dr. Rahim noted "Panic attacks at times, does not like crowded places, or leave the home." (AR at 310.) He increased Claimant's Citalopram. (*Id.*) By July 2016, Claimant was feeling better; she was not as "blah, hopeless, helpless. . . . She still has some problem with anxiety, but has not had any full-fledged panic attacks since she had been seen last time." (*Id.* at 314.) In October 2016 and March and June 2017, Dr. Rahim noted that Claimant did not like crowded places or to leave home, but

also that she had no panic attacks since her last appointments. (*Id.* at 320, 395, 400.) In March, Claimant stated that although she does not like being in crowded places "she can go out to do grocery and so on." (*Id.* at 394.) In June 2017, Dr. Rahim also noted that Claimant's mood was "sad and gloomy." (*Id.* at 400.) Claimant was "not doing well" and was having problems with anxiety and "trying to avoid situations that caus[ed] her anxiety. She did not like being in crowded places." (*Id.* at 399.) Dr. Rahim changed Claimant's medications. Again in October 2017, Dr. Rahim noted no panic, but that Claimant did not like being in crowds or leaving home. (*Id.* at 431.) Claimant had "some" anxiety and was sleeping too much. (*Id.*)

The next treatment note Claimant cites is from October 2018, where Dr. Rahim stated that Claimant had "not been doing very well been very emotional and been getting very moody and irritable and been crying at other times." (*Id.* at 465.) Claimant was having problems with mood swings, panic attacks, and trusting others. (*Id.*) She had not been sleeping. (*Id.*) Claimant also admitted forgetting to take her medication. (*Id.*) Claimant was experiencing emotional stress because her mother was ill and she had to help care for her. (*Id.* at 463.) Claimant said she was experiencing financial stress. (*Id.*) Dr. Rahim changed her medication and encouraged her to seek counseling. (*Id.* at 465.) By December 2018, Claimant was feeling somewhat better. (*Id.* at 469.) She was not feeling as sad, gloomy, hopeless, and helpless, and had not been having crying spells. (*Id.*) She was sleeping over six-to-seven-hours a night. (*Id.*) Although Claimant still had "anticipatory anxiety" and panic attacks, she was hoping to do some volunteer work and work a few hours to help with her financial stress and to keep herself busy. (*Id.*) Claimant was also thinking of getting her driver's license because that would help her be more independent and help with caring for her mother. (*Id.*) In April 2019, Dr. Rahim noted that Claimant was having increased anxiety about getting her driver's license and that Claimant reported panic attacks and that her mother had died at the end of January.

(*Id.* at 475.) Claimant thought her current medications worked somewhat better for her, compared to other medications. (*Id.*) Therefore, Dr. Rahim continued Claimant on those medications.

As noted above, some of the treatment notes cited by Claimant stated that although Claimant did not like crowds, she did not experience panic attacks for months at a time. Moreover, although Claimant would like the Court to assume Claimant's statement that she avoids situations that cause her anxiety applies to all of Dr. Rahim's treatment notes, that assumption is not warranted. While it is clear that Claimant does not like being in crowds, that, alone, does not constitute a disability. In addition, the ALJ noted that Claimant's mental status examinations have been "routinely benign." (AR at 15.) The ALJ concluded that "while the claimant occasionally demonstrated a sad mood, contemporaneous treatment records repeatedly note that she also exhibited full cognition, a well-groomed appearance, normal speech, cooperative behavior, okay mood, normal affect, unimpaired memory, and intact attention and concentration." (AR at 15 (citing, *inter alia*, Dr. Rahim's treatment notes at AR 395, 400, 431, 436, 441, 447, 452, 459, 470, 475).)

While the ALJ acknowledged that Claimant experienced "brief upticks in symptomology," he found that these were "due to life stressors and the periodic ineffectiveness of medication . . . [and] were not representative of her overall symptomatology throughout the period at issue." (*Id.* citing AR at 401 (citations omitted).) The ALJ's conclusion is supported by Dr. Rahim's treatment notes. In March and April 2018, Claimant was experiencing increased anxiety because she had put her father in a nursing home, her mother was ill, and her father eventually died. (*Id.* at 442-48.) In October 2018, Claimant experienced financial stress and stress due to her mother's health issues and was having frequent panic attacks. (*Id.* at 463.) However, by December 2018, Claimant told Dr. Rahim that her panic attacks were not as severe.

(*Id.* at 470.)  Claimant also experienced stress in April 2019 after her mother died and she was worried about attending the crowded memorial service.  (*Id.* at 474.)  Claimant, however, was accepting the January loss of her mother better after some initial difficulty.  (*Id.*)  At that time, Claimant told Dr. Rahim she was only leaving the house to buy groceries and attend doctor appointments.  (*Id.*)  In spite of these stressors, Claimant demonstrated appropriate coping skills in February 2017 when she coped with the death of a friend by keeping busy and reading mystery books.  (*Id.* at 394.)  Claimant also admitted that she did better in spring and summer, did not like cold or cloudy weather, and that she had not done well the previous couple of days because it had been cloudy.  (*Id.*)  Situational stressors cannot provide the basis for a disability finding.  *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010); *Dunahoo v. Apfel*, 241 F.3d 1033, 1040 (8th Cir. 2001).

The Commissioner argues that although Claimant has provided selective citations to Dr. Rahim's treatment notes,

> [P]laintiff has made no attempt to explain how the notes corroborate Dr. Rahim's opined limitations.  *See* Pl's Br. at 5, 8. For example, plaintiff claims Dr. Rahim's notes discussed difficulties with crowded places and leaving her home, yet even if such difficulties were present, such difficulties do not automatically equate to Dr. Rahim's opined limitations concerning over 15 percent time off task, excessive absenteeism, and inability to complete a workday or work at a consistent pace. Pl's Br. at 5 (citing Tr. 310, 314, 395, 400, 431, 465, 469, 475). Plaintiff bears the burden of proving her RFC. *See* 20 C.F.R. § 416.920(a)(4)(iv); *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016); *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005); *accord Young*, 221 F.3d at 1069 n.5. Plaintiff's failure to link the citations to her unsupported claim amounts to asking the Court to ignore plaintiff's burden and comb through the record to make her case for her. However, it is well established that plaintiff cannot ask the Court to reweigh the evidence in her favor. *See Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).

(Doc. 13 at 15.)

The Commissioner is correct. Claimant, herself, told Dr. Rahim that she wanted to get a job and to volunteer. (AR at 469.) Not wanting to be in crowds is not the same as not being able to engage in all work-related activities. Moreover, Dr. Rahim's treatment notes do not support his conclusions related to Claimant's abilities to remember work-like procedures, maintain attention for a two-hour segment, understand and remember detailed instructions, carry out detailed instructions, or sustain ordinary routine without special supervision. (AR at 420-21.) As discussed above, Dr. Rahim consistently stated that Claimant had cooperative behavior, unimpaired memory, and intact attention and concentration. In addition, in all the cited treatment notes, Claimant was only late for one appointment because she thought it was scheduled to begin an hour later than it did. (AR 474.) Thus, there does not seem to be support for the conclusion the Claimant could not maintain regular attendance and be punctual.

In addition, there does not appear to be support in Dr. Rahim's treatment notes for his conclusions regarding Claimant's abilities to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, set realistic goals or make plans independently of others, perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress, or maintain socially-appropriate behavior. (*Id.*) Claimant's impairments do not manifest in behavioral extremes or in the need to take unscheduled rest breaks. Although Claimant experienced fatigue in June 2017, by December 2017, after changing Claimant's medications, Dr. Rahim was not documenting fatigue in his treatment notes. (AR at 399, 435-38.) Treatment notes do not indicate that Dr. Rahim ever discussed goal-setting or Claimant's ability to respond to criticism or negative feedback. To the extent Dr. Rahim supports his conclusions related to Claimant's abilities to deal with the stress of

semiskilled and skilled work, travel in unfamiliar places, use public transportation, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and interact appropriately with the general public were supported by treatment notes documenting panic attacks, as discussed above, medication changes helped Claimant avoid panic attacks.

Claimant asserts that Dr. Rahim supported his opinion that she has panic attacks whenever she attempts work or deals with people: "Ms. Freilinger's panic attacks were not random events, they were caused by triggers noted in Dr. Rahim's opinion form: 'Panic attacks in work or any public setting,' 'Panic attack debilitating in public,' and 'Again, panic attacks when leaving home, public/work settings, anytime around people." (Doc. 17 at 2 (punctuation added, paragraph breaks omitted).) Claimant cites *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) for the proposition that "[w]ith Ms. Freilinger not out attempting to work or deal with people, she would not be having panic attacks per Dr. Rahim's opinions as well as common sense." (*Id.* at 3.) Claimant also relies on 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E) (1999) for the propositions that "[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms" and "[s]uch individuals may be much more impaired for work than their signs and symptoms would indicate." (Doc. 12 at 12 (first set of brackets in original).)

The flaw in Claimant's argument is that while Dr. Rahim's treatment notes consistently state that Claimant does not like being in crowds, Claimant cites only two treatment notes in three years of treatment notes that state she limited her outings because of that dislike. (AR 399, 474.) And, as the Commissioner pointed out, even if Claimant does not like crowds and being around people, she has failed to demonstrate how that necessarily prevents her from working, especially when her symptoms respond to

treatment, albeit with occasional changes, and when Claimant is able to do things like go shopping alone. (AR 218.) Furthermore, as the RFC demonstrates, "crowds" and public interaction are not necessarily part of all types of substantial gainful employment. (AR at 14.) For example, many people who clean office buildings, a job that fits under the description of commercial cleaners, one of the jobs cited by the ALJ in his decision (AR at 19; 1991 WL 673257), do so after business hours when offices are closed and mostly empty.

Dr. Rahim's support consists merely of a conclusory reiteration of Claimant's diagnosis of panic attacks when Claimant is in crowds. There is no elaboration or explanation about what signs and symptoms Claimant experiences when she has a panic attack, how long her panic attacks last, or how her panic attacks might interfere with her ability to work. Thus, Dr. Rahim's support is similar to the support provided by a physician in *Anderson v. Astrue*, whose only explanatory statement on a checkbox form was the conclusory statement that the claimant "has fibromyalgia which causes a lot of joint pain for her." 696 F.3d 790, 793 (8th Cir. 2012). *Anderson* concluded that the checkbox opinion form was conclusory and had little evidentiary value. *Id.* at 793-94 (conclusory checkbox form has little evidentiary value when it "provides little to no elaboration") (quoting *Wildman*, 596 F.3d at 964).

In addition, Claimant's case can be distinguished from *Hutsell*, 259 F.3d 707. The claimant in *Hutsell* was diagnosed with various chronic schizophrenia-based disorders, including schizoaffective disorder, bipolar type, and her intellectual functioning was borderline. *Id.* at 709. The claimant took several different medications and frequently reported to her primary treating physician for medication checks and adjustment. *Id.* A neuro/clinical psychologist determined that the claimant's condition "could evolve into a reasonably short term frank psychosis" if she was confronted with stress, but that with medication and a low-stress environment, she would likely continue to do well. *Id.*

19

Another physician stated that the claimant's "prognosis for a recurrent Schizophrenic episode is good." *Id.* A consulting psychiatrist opined that the claimant "could not understand and remember simple primarily oral instructions six hours per day five days per week" and "[o]nly a blood relative or close family friend . . . could tolerate [Hutsell's] episodes of confusion," concluding that "[r]epeat hospitalization would probably be precipitated by the stress of increased expectations of her such as she would experience with any full-time job." *Id.* at 710 (alterations in original). A consulting psychologist opined that the claimant's "ability to deal with work stresses and maintain concentration and attention as both fair and 'poor to none,' which means '[n]o useful ability to function in this area.'" *Id.* (alteration in original). A second consulting psychologist who examined the claimant three years later, found the claimant markedly limited in several areas of interaction, and opined, "[W]hile she has responded favorably to neuroleptic [antipsychotic drug] use, she is still significantly impaired and would have great difficulty obtaining and maintaining gainful employment." *Id.* (second alteration in original). *Hutsell* held that the ALJ relied too heavily on indications in the medical records that the claimant was "doing well." *Id.* at 712. *Hutsell* reasoned that since the claimant's impairments required her to be hospitalized three times for psychotic episodes that occurred "unpredictably" and because her treating physician had "not discharged her from treatment and requires her to see him frequently and that other doctors have concluded that Hutsell's work skills are seriously deficient, 'doing well' as a chronic schizophrenic is not inconsistent with a finding of disability." *Id.* at 712-13.

Here, Claimant is not as impaired as the claimant in *Hutsell*. She has not been hospitalized due to her mental impairments and only sees Dr. Rahim every three months on average. (AR at 297-322, 379-403, 430-77; 418.) In addition, as will be discussed below, no physician other than Dr. Rahim has opined that Claimant lacks the ability to engage in any kind of fulltime work because of her mental impairments.

Finally, Claimant's argument that the ALJ's "complaint" that Dr. Rahim's opinion was in a "check-list form [that] appeared to have been completed as an accommodation to the claimant" was not a sufficient rationale, by itself, to assign Dr. Rahim's opinions little weight is without merit. (Doc. 12 at 6.) The ALJ did not rely only on the format of Dr. Rahim's opinion for assigning the opinion little weight. (AR at 17.) As discussed above, the ALJ also relied on the record as a whole and the lack of objective medical evidence supporting Dr. Rahim's opinions. Moreover, ALJs are entitled to consider the cursory nature of checklist-style opinions as a factor when they weigh the opinions. *See Thomas*, 881 F.3d at 675. In addition, the ALJ was permitted to consider that an opinion written at the request of an attorney was less persuasive than one written during the course of treatment. *See Hurd v. Astrue*, 621 F.3d 734, 739 (8th Cir. 2010) (opinion provided at request of attorney rather than in course of treatment one of several reasons to affirm ALJ's assignment of little weight to opinion). This seems to be especially true in this case where, in spite of the extreme limitations Dr. Rahim assigned in the opinion, on the day Claimant asked Dr. Rahim to complete the form, he noted that Claimant thought her current medications "seemed[ed] to be working somewhat better as compared to other medications" and he did not make any medication changes. (*Id.* at 474, 476.) Under "mood," Dr. Rahim noted that day that Claimant was "[h]andling it better now, mom died on 1/26/2019."

In conclusion, while Dr. Rahim's treatment notes certainly document Claimant's on-going discomfort with crowds, they also show that Claimant's condition is amenable to medication management. Moreover, though Claimant is worried about having panic attacks when she leaves her home, she takes Alprazolam as needed for anxiety and panicky feelings and has taken that medication for that purpose since at least March 2016. (AR at *e.g.* 301, 431-32.) Although Dr. Rahim's treatment notes do not overwhelmingly weigh in favor of one decision or another, "even if inconsistent conclusions could be

drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence in the record as a whole." *See Guilliams*, 393 F.3d at 801. The Court cannot reverse a decision simply because evidence would have supported a contrary decision. *See Moore*, 572 F.3d at 522. Therefore, this factor does not weigh in favor of giving the opinion more weight.

### b. Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4).

Claimant argues that the ALJ's decision is inconsistent with her function report and her testimony. (Doc. 12 at 5 (citing AR at 52, 214).) She also argues that contrary to the ALJ's conclusion, her daily activities do not "reflect[] an ability to perform full-time competitive work." (*Id.* at 6-7.) Claimant further argues the ALJ was requiring her to prove she was bedridden in order to qualify for benefits. (*Id.* at 7 (citation omitted).)

The cited pages of Claimant's function report and hearing testimony state the following. Claimant testified to the following:

> I—leaving the house causes panic attacks, being around other people causes panic attacks. I can't focus. I don't take care of myself on a regular basis. I can't sit, stand or move around for long periods of time. I don't know how else to answer the question other than that kind of stuff.

(AR at 52.) The cited part of Claimant's function report states that she has "become a shut-in. Leaving home is limited to only necessary outings: Dr., groceries, household items, stuff like that." (*Id.* at 214 (spelling corrected and punctuation added).) However, in the same document, Claimant also stated that she camps with friends in the summer, and enjoys reading and taking care of plants. (*Id.* at 218.)

Paula Binger, LISW[5], LMHC[6], is Claimant's counselor. As the ALJ noted, Ms. Binger's notes contradict Claimant's statements that she does not interact with others or leave her home, except to buy groceries or to go to the doctor. (AR at 16 ("Furthermore, the record reflects that she leaves the house unaccompanied, goes on dates, spends time with friends, volunteers, and helped her mother.") (citing, among other exhibits, 9F, containing Ms. Binger's treatment notes).) In June 2016, Ms. Binger noted that Claimant was "in an upbeat mood . . . and agrees that she is feeling better now that she getting out and about in the sun and with friends. 'Summer time is the best time of the year for me.'" (AR at 337.) In January 2017, Claimant was sad because a friend had moved away. (*Id.* at 343.) In May 2017, Claimant was mourning the death of a close friend she was with as she was dying. (*Id.* at 346.) Claimant also discussed "finally" ending a relationship with a man who treated her disrespectfully. (*Id.*) Ms. Binger praised Claimant for finally saying, "No" to the man and not allowing him to use her anymore. (*Id.*) She also acknowledged that Claimant had lost two friends in the past few months—one via a move and one by death—and normalized the grieving process. (*Id.*) In April 2017, Claimant reported to Ms. Binger that she had an appointment in a couple of months with vocational rehabilitation about her arthritis and that "[o]therwise, she is doing well with her moods." (*Id.* at 412.) Claimant told Ms. Binger she was worried about her mother because her mother did not take care of herself, but did not mention panic or stress. (*Id.*) In July

---

[5] "LISW" is an abbreviation for "licensed independent social worker." Social Work Guide, Iowa Social Work Licensing Requirements, https://www.socialworkguide.org/licensure/iowa/
[6] "LMHC" is an abbreviation for "licensed mental health counselor." *Requirements to Obtain a Permanent Mental Health Counselor License*, https://idph.iowa.gov/Portals/1/userfiles/270/MHC%20Licensure%20Brochure-Permanent%20License%20%2803_2017%29.pdf

2017, Dr. Binger stated Claimant "is pleased with her med adjustment and says that she feels better. 'I am meeting a new man and having fun.'" (*Id.* at 414.)[7]

Similarly, when Claimant met with consulting examining physician Adriana Taseva, she stated that although she did not like leaving home, she had never been

---

[7] Claimant argues that Ms. Binger's treatment notes support her allegations. (Doc. 17 at 3.) First, Claimant cites a note wherein Claimant stated she was struggling with "empty nest syndrome." (*Id.* (citing AR at 334).) Claimant struggled with wanting her children to stay with her, even though she knew they had to grow up. (*Id.*) Ms. Binger wrote the following:

> [H]elped her reframe her perspective on what it will mean to "be alone" when the kids move out. She thinks she is unable to take care of herself and she wants the kids to stay close. . . "[W]hat am I going to do all day when they are gone . . . . sit around the house?" I helped her recognize that she is already spending quite a bit of time on her own already as [t]he kids are not home as much as they used to be. Dominique is able to recognize that she is a good parent and her kids are growing up very nicely.

(*Id.* (ellipses and quotation marks in original).)

Claimant argues that this treatment note is consistent with Dr. Rahim's opinion because Claimant thought she was unable to take care of herself. This argument is without merit. First, Dr. Rahim did not opine that Claimant could not take care of herself. (AR at 418-22.) Second, Claimant's remark about "sitting around the house all day" leads me to conclude that Claimant was not so much looking for someone to take care of her as for a way to fill her time when her children left home. Moreover, if Claimant's theory of the case is consistent, Claimant would do better at home than anywhere else because she would not have panic attacks at home. Third, as discussed more, *infra*, Claimant is able to manage all of her personal care needs, take medication without reminders, cook, wash dishes, vacuum, and do yard work. (AR at 215-16.) Thus, even if this was somehow more than an isolated statement, substantial evidence shows that Claimant can take care of herself. Fourth, although Claimant may have been concerned about being alone at the beginning of her session with Ms. Binger, by the end of the session, she recognized the reality of the situation and that she was a good parent who was almost done raising her children. (*Id.* at 334.)

Claimant also cites a treatment note that states she needed assistance to apply for SSI. (Doc. 17 at 3 (citing AR at 343).) Claimant called the process of applying for SSI "overwhelming." (AR at 343.) I do not find that Claimant's statement has any bearing on her claim. Many people find governmental bureaucracy daunting. This is not a sign of disability.

24

hospitalized for anxiety, anxiety was not "taking over her life like it did in the past," and she felt she was stable on her current medications. (*Id.* at 356.) An impairment that is controlled with treatment or medication is not considered disabling. *Brace v. Astrue*, 578 F.3d. 882, 885 (8th Cir. 2009) (citations omitted). Moreover, the ALJ properly considered that Claimant has never received any aggressive mental health treatment, instead receiving only routine conservative medication management. (AR at 16.) The ALJ properly considered the conservative treatment claimant received as inconsistent with the severity of her alleged subjective complaints. *See Beckley v. Berryhill*, No. 16-CV-03082-CJW, 2017 WL 1496934, at *8 (N.D. Iowa Apr. 25, 2017) (citing *Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000); *Smith v. Shalala*, 987 F.2d 1371, 1374-75 ( 8th Cir. 1993)).

The ALJ also noted that "[d]espite her impairments, the record suggests that the claimant has engaged in a somewhat normal level of daily activity and interaction." (AR at 16.) Claimant attends to her own personal care needs, takes medication without reminders, prepares meals, does laundry and dishes, vacuums, and does some yard work. (*Id.* at 16, 215-16.) Claimant also shops independently in stores; can pay bills, handle a savings account, checkbook, and money orders; reads; takes care of her cat; and stated that she follows both written and spoken instructions "pretty good." (*Id.* at 16, 215-16, 219.)

Contrary to Claimant's argument, the ALJ did not require her to be "bedridden" before being eligible for disability benefits. (Doc. 12 at 7 (citations omitted).) Rather, the ALJ properly considered Claimant's daily activities that undermined Dr. Rahim's opinion. *See* 20 C.F.R. § 416.927(c)(4); *Anderson*, 696 F.3d at 794 ("While we recognize that a claimant 'need not be completely bedridden . . . to be considered disabled,' if a doctor evaluates a patient as having more physical limitations than the

patient actually exhibits in her daily living, an ALJ need not ignore the inconsistency.") (ellipses in original; internal citation omitted).

Finally, *Lucus v. Saul*, cited by Claimant (Doc. 12 at 6), can be distinguished from the case at bar because the ALJ in that case failed to give good reasons for assigning a treating physician's opinion partial weight. 960 F.3d 1066, 1069 (8th Cir. 2020). The ALJ in this case stated that Dr. Rahim's opinion was inconsistent with the objective medical evidence, including Claimant's "benign clinical findings and relatively normal activities of daily living." (AR at 17.) The ALJ cited Dr. Rahim's treatment notes throughout his decision to support his conclusions that the objective medical evidence did not support the severity of Claimant's alleged allegations. (*Id.* at 13-16 (citing Exhibits 8F and 11F).) Thus, while the ALJ could have clearly summarized these findings when he was addressing Dr. Rahim's opinion, "the ALJ's arguable deficiency in opinion-writing technique had no bearing on the outcome of [the] case and does not require remand." *Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011) (internal quotation omitted). Thus, I find that the ALJ in this case gave good reasons for giving Dr. Rahim's opinion the weight he did, unlike the ALJ in *Lucus*.

Based on the foregoing, I find that the ALJ's decision on this issue was supported by substantial evidence on the record as a whole, and was therefore within the acceptable zone of choice within which the ALJ can decide the case and should not be disturbed. *See Hacker*, 459 F.3d at 936.

### c. Recommendation

I **recommend** the District Court affirm the ALJ's decision on this issue.[8]

---

[8] Claimant does not challenge Dr. Rahim's opinion based on any other 20 C.F.R. § 404.1527(c) factor and I do not find that the other factors, on the whole, weigh in favor of giving Dr. Rahim's opinion more weight or in favor of remand.

26

***B.*** ***Whether the ALJ Erred by not Including in the RFC Limitations Found by State Agency Reviewing Psychological Consultants***

On March 28, 2017, Russell Lark, Ph.D., reviewed Claimant's records for the state agency and concluded that Claimant had mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in concentrating, persisting, and maintaining pace; moderate limitations in adapting or managing oneself; and moderate limitations in her ability to carry out detailed instructions. (AR at 16, 68-69.) Dr. Lark opined that Claimant's "cognitive functions are adequate for a variety of moderately complex tasks. . . . [and] that [C]laimant is able to complete 3-4 step tasks on a sustained basis." (*Id.*) On October 31, 2017, Vincent Marziano, Ph.D., affirmed Dr. Lark's opinions on reconsideration. (*Id.* at 84.)

The ALJ gave the state agency psychological consulting psychologists' opinions great weight, stating that the consulting psychologists are experts in Social Security disability programs and the opinions were supported by objective medical evidence, were based on the psychologists' areas of expertise, and were "reasonably consistent with the record as a whole." (*Id.* at 16-17.)

***1.*** ***Claimant's Arguments***

Claimant argues that the ALJ failed to account for the consultants' 3-4 step task and detailed task limitations in the RFC and did not explain why. (Doc. 12 at 9.) Claimant argues that remand is required so that the ALJ can explain the weight afforded to the parts of the opinions concerning detailed instructions and 3-4 step tasks. (*Id.* at 10 (citing *Gann v. Berryhill*, 864 F.3d 947, 952-53 (8th Cir. 2017); *Burns v. Comm'r of Social Security*, No. 1:18-cv-72-LTS-MAR (N.D. Iowa Jan. 10, 2020).) Claimant asserts that the ALJ's failure to include the limits in the RFC was harmful because the

hypothetical the ALJ posited to the VE was based on this RFC and thus did not include all of Claimant's impairments. (*Id.*)

## 2. *Analysis*

This Court has recently addressed the issue of whether remand is required when the ALJ gave great weight to the opinions of the state agency reviewing consultants, but failed to include limitations contained in the opinions in the RFC. *See Loeckle v. Saul*, No. 19-CV-3031-LTS-KEM, 2020 WL 6821077, at *11 (N.D. Iowa Aug. 11, 2020), *R. & R. adopted as modified*, 2020 WL 5518620 (N.D. Iowa Sept. 14, 2020), *appeal docketed*, No. 20-3373 (8th Cir. Nov. 13, 2020); *Bantz v. Berryhill*, No. 17-CV-00002-LRR, 2018 WL 3078111, at *3 (N.D. Iowa Feb. 22, 2018), *R. & R. adopted*, 2018 WL 1522693 (N.D. Iowa Mar. 28, 2018); *Johnson v. Comm'r of Soc. Sec.*, No. 17-CV-3045-LTS, 2018 WL 4868986, at *5 (N.D. Iowa Aug. 27, 2018), *R. & R. adopted*, 2018 WL 4489458 (N.D. Iowa Sept. 19, 2018).

> Several district courts in the Eighth Circuit have held that remand may be appropriate when the ALJ purportedly gives "great weight" to the opinion of a state agency consultant but fails to adopt some of the limitations contained in that opinion without explanation. *See McCaskill v. Berryhill*, No. 4:17-CV-04121-KES, 2018 WL 2144553, at *19-21 (D.S.D. Apr. 20, 2018) (recommending holding that substantial evidence did not support the ALJ's RFC determination when the ALJ gave "great weight" to the state agency consultant's RFC opinion but failed to include many limitations imposed by that opinion, thus neglecting to "explain *what portions* of [the opinion] are rejected and *why*"), *report and recommendation adopted*, 2018 WL 2138659 (D.S.D. May 9, 2018); *Webster v. Astrue*, 628 F. Supp. 2d 1073, 1090-92 (D. Neb. 2009)(holding that remand was required when the ALJ purportedly "agree[d] with the detailed analysis" of the state agency consultants but failed to include in the RFC many of the moderate limitations found by the state agency consultants, which the vocational expert testified in combination would prohibit sustained work); *see also Sanders v. Astrue*, No. CIV. 11-1356 (JNE/JJG), 2012 WL 1657922, at *12-13 (D. Minn. Apr. 17, 2012) (recommending holding that when the ALJ "professed to place significant weight on" the state agency

28

psychological consultant's opinion but did not restrict the claimant to "brief" and "superficial" interaction with others, as the state agency consultant had, "[t]he case should be remanded so that the ALJ can incorporate [additional limitation] or explain why he rejected these limitations"), *rejecting report and recommendation in relevant part*, 2012 WL 1658988 (D. Minn. May 11, 2012) (holding that remand was not required because substantial evidence otherwise supported "the ALJ's decision regarding [the claimant's] recommended interaction with coworkers," and because the work the ALJ found the claimant could perform did not seem to require more than brief and superficial contact with coworkers); *cf. Lockwood v. Colvin*, 627 F. App'x 575, 577 (8th Cir. 2015) (holding that when the ALJ failed to address the weight given to the state agency consultants' opinions, remand was not required because the medical consultant was not an acceptable medical source and the psychological consultant's opinion was not inconsistent with the ALJ's RFC determination).

*Johnson*, 2018 WL 4868986, at *5; *Loeckle*, 2020 WL 6821077, at *11 n.9.

However, remand on this basis is not always required. *Loeckle* and *Bantz* are instructive. In *Loeckle*, the state agency consultants found, among other things, that the claimant was limited to work with no more than 3-4 step commands. 2020 WL 6821077, at *9. The ALJ assigned the opinions either significant or great weight—the case uses both adjectives. *Id.* at *10, *12. In spite of this, the ALJ found the claimant could perform two jobs requiring reasoning level 3. *Id.* at *11. Chief Magistrate Judge Mahoney found these two limitations were inconsistent with each other. *Id.* (using "great weight" for comparison). The claimant argued that the RFC and the ALJ's step 5 hypothetical should have included a reasoning-level limitation or otherwise explained the ALJ's failure to include that limitation, despite assigning the state agency consultants' opinions great weight. *Id.* Judge Mahoney discussed two cases from this Court that both relied on *Gann v. Berryhill*, 864 F.3d 947 (8th Cir. 2017). *Id.* at *11-12. In *Gann*, the VE's testimony did not support the ALJ's step five finding because although the ALJ assigned significant weight to the opinions of the state agency consultants, the ALJ did

29

not include the consultants' adaptive limitations in the hypothetical presented to the VE. *Id.* at *11.

Judge Mahoney explained that Chief Judge Strand relied on *Gann* to hold in *Block v. Saul*, No. C18-118-LTS, 2020 WL 1505566, at *6-7 (N.D. Iowa Mar. 30, 2020), that "when the only medical opinions in the record are from the state agency consultants, and the ALJ assigns those opinions great weight and notes they are consistent with the record as a whole, the ALJ errs by failing to adopt a limitation found by the state agency consultants or by otherwise failing to explain the omission." *Id.* (quotations omitted). *Block* distinguished *Gann* because the ALJ found the claimant did not suffer from severe mental impairments at step two, the consultative examiner's opinion was not the only medical opinion in the record, and the ALJ adequately articulated reasons for excluding additional limitations in the opinion from the RFC. *Id.* at *12.

Judge Mahoney found the facts of *Loeckle* more similar to *Gann* than to *Block* or *Burns v. Saul*, No. 18-cv-72-LTS (N.D. Iowa Jan. 10, 2020), which she did not discuss. *Id.* Judge Mahoney noted that not only did the ALJ assign the state agency consultants' opinions great weight and fail to explain the failure to include a reasoning-level limitation that was supported by the opinions, the only other medical opinion in the record addressing the claimant's mental limitations found the claimant more limited than the state agency psychological consultants. *Id.* Thus, Judge Mahoney recommended finding that the ALJ erred by failing to limit the claimant to reasoning level 2 positions or by otherwise failing to explain the failure to adopt the limitation. *Id.* Notwithstanding this conclusion, Judge Mahoney recommended finding the error was harmless because one of the three jobs identified by the VE in response to the ALJ's hypothetical required reasoning level 2. *Id.* Thus, one job remained with 85,000 positions in the national economy that the claimant could perform. *Id.* (noting that on harmless-error review, the Eighth Circuit has held this number of jobs constitutes substantial evidence supporting a

step-five determination (citing *Weiler v. Apfel*, 179 F.3d 1107, 1110-11 (8th Cir. 1999) (32,000 jobs significant number of jobs)).

On review, Chief Judge Strand modified Judge Mahoney's opinion in one respect. *See Loeckle v. Saul*, No. C19-3031-LTS, 2020 WL 5518620, at *10, *12 (N.D. Iowa Sept. 14, 2020). When reviewing the ALJ's RFC determination, Judge Strand noted that at step four of the five-step process, the ALJ stated the following:

> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The claimant contended that he has limitations in concentrating generally, following instructions, and completing tasks. (Exh. 4E, p. 5.) He testified that, in one job, the warehouse manager was upset because he was [sic] do 98 cases and was supposed to do approximately 200. In March 2017, Ms. Zech indicated that the claimant took significantly longer than other employees did to put away shipments of merchandise. (Exh. 14E.) However, the claimant has shown an ability to work full-time, sometimes with an excessive number of hours. He mentioned to a medical professional in October 2014 that he worked 11-7 and only got 20-minute breaks. (Exh. 7F, p. 83.) He also had stated in December 2013 that he was working 64 hours seven days a week and also complained about the number of hours worked in January 2014; the treatment notes indicates that he stated 100 hours. (Exh. 7F, pp. 123, 126.) In addition, the claimant indicated in April 2016 that he is able to drive, prepare meals, watch TV, and manage funds. (Exh. 4E, pp. 3-4.) Accordingly, the evidence substantiates only a moderate limitation in this domain.

*Id*. at *10. Judge Strand reasoned that this suggested that "the ALJ did not find a work-related or functional limitation was necessary in the RFC for Loeckle's moderate limitations in this area based on his work history and daily activities. She also mentioned that Dr. Lassise found his concentration was within normal limits." *Id*. Judge Strand held that while the ALJ could have been more explicit in her step four findings "regarding why she chose not to incorporate any functional limitations related to concentration,

31

persistence or pace, it is clear from her decision as a whole that she did not find Loeckle's moderate limitations in this area mandated a functional limitation in the RFC." *Id.*

Similarly, in *Bantz*, the ALJ failed to include a limitation from the state agency psychological consultants' opinions limiting the claimant to "light, unskilled work, with. . . . at least simple, repetitive tasks on a sustained basis in a low stress environment," in spite of giving the opinions great weight. 2018 WL 3078111, at *5. Judge Mahoney found that even if the ALJ erred by not explicitly including a limitation to "unskilled work" or "simple repetitive tasks," in the RFC, the error was harmless because the jobs identified were jobs that a person limited to unskilled work, which encompasses "simple repetitive tasks," could perform. *Id.* at *6. The ALJ did not err in failing to include a limitation to a "low stress work environment" because the ALJ was not required to rely on one particular doctor's opinion, the claimant's treating psychiatrist included no such limitation in his RFC assessment, and because the ALJ did not assign controlling weight to the opinions of the state consulting psychologists. *Id.* Although the ALJ had assigned little weight to the opinion of the claimant's treating psychiatrist, she did assign weight insofar as the opinion was consistent with the ALJ's RFC findings. *Id.* at *3, *6. Judge Reade adopted Judge Mahoney's opinion without modification. *Bantz v. Berryhill*, No. 17-CV-2-LRR, 2018 WL 1522693, at *4 (N.D. Iowa Mar. 28, 2018). *Cf. Johnson*, 2018 WL 4868986, at *6-7 (recommending remand with instructions for the ALJ to either (1) impose limitations related to interacting with coworkers and supervisors, or (2) more fully discuss the failure to include these limitations related to ability to interact with supervisors because multiple treatment records supported the claimant's difficulties interacting with people).

I find that the case at bar is analogous to *Loeckle* and *Bantz*. The RFC in this case contains no reasoning-level limitation, although the VE was informed about Claimant's high school-level education and lack of any relevant work. (AR at 55.) In addition, like

Judge Strand in *Loeckle*, I find that the ALJ sufficiently explained at step four why he did not include a 3-4 step limitation. In relevant part, the ALJ provided the following explanation for the RFC.

> With regard to the claimant's mental impairments, the objective and clinical evidence is inconsistent with the severity of her allegations. In this way, a review of the claimant's treatment notes reveals that while she did experience brief upticks in symptomology mainly due to life stressors and the periodic ineffectiveness of medication, these upticks were not representative of her overall symptomatology throughout the period at issue *(see, e.g.,* Exhibits 8F/24-25; 1 lF/19-23, 51 ). Instead, the record reveals that her mental health has been predominantly stable with appropriate treatment during the relevant period. As evidence of the foregoing, the findings from the claimant's mental status examinations have remained routinely benign.
>
> To this end, while the claimant occasionally demonstrated a sad mood, contemporaneous treatment records repeatedly note that she also exhibited full cognition, a well-groomed appearance, normal speech, cooperative behavior, okay mood, normal affect, unimpaired memory, and intact attention and concentration *(see, e.g.,* Exhibits 3F/16, 19; 5F/4; 7F/5, 17-18; 8F/17-18, 22-23; 9F/5, 7; llF/7-8, 13, 18, 24, 29, 36, 41, 46-47, 52). Additionally, the records indicate that the claimant's mental health is responsive to medication. . . . Moreover, . . . . the treatment that the claimant has received during the relevant time period has essentially been entirely routine and conservative in nature, consisting of medication management.

(*Id.* at 15-16.) As discussed above, Dr. Rahim's opinion was supported by the record as a whole, which distinguishes this case from *Bantz*, wherein both the ALJ and Judge Mahoney found the relevant part of the treating psychiatrist's opinion supported the state agency consultants' opinion. 2018 WL 3078111, at *6. Moreover, the state agency consultants in *Loeckle* found that the claimant had moderate limitations in the ability to carry out detailed instructions, just as the state agency consultants did in this case. 2020 WL 6821077, at *9. Significantly, "moderate limitation" in mental functioning merely

means that a claimant's ability to function in a particular area "independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. pt. 404, subpt. P, app. 1-pt. A2 (addressing part B criteria). Thus, by definition, a moderate limitation in the ability to carry out detailed instructions is not disabling. The ALJ found and I agreed that Claimant could follow both written and spoken instructions and did not demonstrate problems with concentration. (*E.g.*, AR at 219 (Claimant's function report where she said she could follow instructions "pretty good").)

Therefore, I **recommend** the District Court find the ALJ did not err by omitting a limitation on understanding detailed instructions or to 3-4 step tasks in the hypothetical or the RFC. Even if I am wrong and the ALJ erred in failing to include these limitations, I further find that such a failure constituted harmless error.

The jobs the VE provided were cleaner, commercial; hand packager; cleaner II; and cleaner, housekeeping. (*Id.* at 56.) Cleaner, commercial requires reasoning level 1. *DOT* 381.687-014, 1991 WL 673257. Cleaner, housekeeping also requires reasoning level 1. *DOT* 323.687-014, 1991 WL 672783.[9] Hand packager requires reasoning level 2. *DOT* 920.587-018, 1991 WL 687916. Cleaner II also requires reasoning level 2. *DOT* 919.687-014, 1991 WL 687897.[10]

Because all the jobs were at a level that was lower than the 3-4 step level Claimant argues was omitted from the RFC and hypothetical and because reasoning level 1 and 2 jobs are appropriate for a claimant who has moderate limitations in the ability to carry

---

[9] Reasoning level 1 jobs require workers to "[a]pply commonsense understanding to carry out simple one- or two-step instructions [and d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." https://www.oalj.dol.gov/PUBLIC/DOT/ REFERENCES/DOTAPPC.HTM.

[10] Reasoning level 2 jobs require workers to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and d]eal with problems involving a few concrete variables in or from standardized situations." *Id.*

out detailed instructions, I find the jobs were appropriate. *See Loeckle*, 2020 WL 6821077 at *9 (state agency consultant assigned claimant moderate limitations in ability to carry out detailed instructions, among other things). Therefore, I **recommend** the District Court find any error related to limitations on understanding detailed instructions or to 3-4 step tasks in the hypothetical or the RFC was harmless.

## C.  *Whether the ALJ Properly Evaluated Claimant's Subjective Complaints*

### 1.  *Relevant Law*

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id.* § 404.1529(b),(c). When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski* factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[11] An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[es]

---

[11] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v),(vi).

and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id.* § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

### 2. Analysis

In large part, Claimant's credibility arguments are the same arguments she made regarding other issues in this case.

#### a. Situational Stressors

Claimant argues that that ALJ inappropriately relied on Claimant's apparent periods of stability and symptom control with only "brief upticks due to life stressors" as a reason to deny benefits. (Doc. 12 at 12.) As stated above, the ALJ is tasked with evaluating the objective medical evidence; daily activities; the duration, frequency and intensity of the symptoms; precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and her functional restrictions when evaluating credibility. *Polaski*, 739 F.2d at 1322. Thus, as discussed in part III.A, *supra*, the ALJ properly considered that Claimant's symptoms increased due to situational stressors such as financial strain, the death of a parent or a friend, and weather. (AR at 15, 394, 442-48, 463.) Claimant cites *Hutsell*, for the proposition that "[g]iven the unpredictable course of mental illness, symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." 259

36

F.3d at 711 (internal quotation marks and brackets omitted). As also previously discussed, Claimant here can be distinguished from the claimant in *Hutsell* who was diagnosed with various chronic schizophrenia-based disorders, including schizoaffective disorder, bipolar type and her intellectual functioning was borderline. 259 F.3d at 709. The claimant in *Hutsell* also had a history of multiple hospitalizations due to mental health symptoms and several people opined that she would be unable to hold fulltime work. *Id.* at 709-10, 712-13. Finally, Claimant's citation to 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E), which states "[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms," is misplaced because claimant has depression and anxiety (AR at 12), not a psychotic disorder.

### b.      The ALJ's Alleged Inferences Regarding Dr. Rahim's Opinion

Claimant argues that the ALJ inappropriately drew his own inferences from the mental status examinations while rejecting Dr. Rahim's opinions. (Doc. 12 at 12.) Claimant states that the ALJ's "rejection of the treating Dr. Rahim's opinions without providing good reasons also means this rationale by the ALJ was not a good reason for the ALJ to find Ms. Freilinger was not credibly reporting her mental limitations." (*Id.*) As previously discussed, the ALJ found Dr. Rahim's opinion inconsistent with the objective evidence in the record. (AR at 17.) As discussed in part III.A, *supra*, I found that the ALJ's decision was supported by substantial evidence on the record as a whole. As previously discussed, the ALJ cited Dr. Rahim's opinion in several places in his decision as support for his conclusions. (AR at 13-16.) Claimant does not cite any places in the decision where the ALJ inappropriately drew his own inferences and I do not find any such inferences. Thus, based on this discussion and the discussion in part III.A, I find this argument need not be further considered. *See Singer v. Harris*, 897 F.3d 970, 980 (8th Cir. 2018) (holding that when plaintiff did not direct the court to a place in the

record where it could find alleged errors, the court would only consider the arguments that were supported by appropriate citations) (citing *Manning v. Jones*, 875 F.3d 408, 410 (8th Cir. 2017)).

### c.     *Claimant's Activities*

Claimant argues that the ALJ incorrectly relied on her activities to conclude she was not credibly reporting her limitations.  (Doc. 12 at 12-13.)   It is well-established that a claimant's daily activities are an appropriate area of inquiry for an ALJ evaluating a claimant's credibility.  *See Polaski*, 739 F.2d at 1322.  Claimant does not state what activity, in particular, she takes issue with the ALJ assessing and I find that all of the activities the ALJ mentioned were appropriate for this discussion.   (AR at 16.) Moreover, Claimant's reliance on *Combs v. Berryhill*, 878 F.3d 642 (8th Cir. 2017) is misplaced because the ALJ in the instant case cited to substantial evidence when determining the weight to assign to Dr. Rahim's opinion.  (AR at 13-16.)  *Contra Combs*, 878 F.3d at 647 (ALJ relied on his own inferences regarding the relevance of vague terms in treatment notes when determining the relative weight to assign to opinions that reached contradictory conclusions).   In addition, as discussed above, the ALJ did not require Claimant to be bedridden before she was entitled to benefits.

### d.     *Limited Work Activity*

Finally, Claimant asserts that her limited work history was "not a sufficient rationale for the ALJ to find Ms. Freilinger was not credibly reporting her mental limitations." (Doc. 12 at 13.)  Claimant relies on *Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008) to support her argument.   (*Id.*)  Claimant includes a parenthetical in her citation to *Ford* that quotes the following sentence from the case, "After careful consideration of the record in this case, we cannot say that it weighs so heavily against Ms. Ford's credibility that the ALJ would necessarily have disbelieved her absent the erroneous inferences that he drew from the record." (*Id.* (citing *Ford*, 518 F.3d at 983).)

Claimant's citation is misplaced.  The part of the case Claimant cites refers to the ALJ's failure to properly weigh the claimant's testimony, activities, and medical records.  *Ford*, 518 F.3d at 982-83.  The *Ford* court actually agreed with the ALJ's assessment of the claimant's prior work activity and conclusion that the claimant quit her prior job voluntarily, not because of an impairment, and that she did not apply for another job because she "knew" she would be let go once she had a muscle spasm, even though she often went months without having a spasm.  *Id.* at 982 (quoting "knew").  It is well-established that an ALJ may consider a claimant's work history as part of a credibility analysis. *See Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) ("A lack of work history may indicate a lack of motivation to work rather than a lack of ability.") (citation omitted); *Woolf v. Shalala,* 3 F.3d 1210, 1214 (8th Cir.1993) (claimant's credibility lessened by poor work history).  Here, Claimant's lack of work history and apparent lack of motivation to find work was but one factor the ALJ considered when evaluating Claimant's credibility.  (AR at 12-18.)  Thus, I find that the ALJ did not give the factor outsized weight.

Based on this discussion and the discussion in part III.A referenced herein, I **recommend** the District Court affirm the ALJ's credibility findings.

## *IV.  CONCLUSION*

For the foregoing reasons, I respectfully recommend that the District Court **affirm** the decision of the ALJ.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P.

72.	Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 4th day of February, 2021.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa